# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **LISA POTTS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:15-CV-1928-VEH** |
| | ) | |
| **CITY OF BESSEMER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## <u>MEMORANDUM OPINION AND ORDER</u>

This employment discrimination civil action is filed by the Plaintiff, Lisa Potts, against the Defendant, the City of Bessemer, Alabama ("the City"). The Plaintiff alleges that the City discriminated against her, based on her gender, when it denied her a promotion. The Complaint alleges one count of "Gender Discrimination" in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e through 2000e-17 ("Title VII").

This case comes before the Court on the City's Motion for Summary Judgment (doc. 21), and the City's "Motion to Strike Portions of [the] Plaintiff's Evidentiary Materials" (doc. 32). For the reasons stated herein, the Motion for Summary Judgment will be **DENIED**. Because resolving the Motion To Strike is not necessary

in order to rule on the Motion for Summary Judgment[1], the Motion To Strike will be

**DENIED as moot**.

## I.     STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or

---

[1] The Motion To Strike seeks to strike some of the Plaintiff's evidence as to Strother's work history, and evidence as to other gender based comments, harassment, and employment practices. As explained *infra*, the Court finds that, even adopting the City's evidence as to Strother's work history, summary judgment is due to be denied. Similarly, the Court ignores the additional gender and harassment based evidence as such evidence is not necessary for the Plaintiff to survive summary judgment.

2

by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such

an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

4

## II.    FACTS[2]

### A.    The Organization of the Public Works Department of the City of Bessemer

Because the Plaintiff claims that she was denied a promotion into the position

of "Public Works Supervisor" in the City of Bessemer's Public Works Department,

an examination of the organization of that department is appropriate.

At all times relevant to this case, Bill McLaughlin was the Director of the City

of Bessemer Public Works Department. The Assistant Director who reported to him

was Lawrence Hatter. The Public Works Department has several "Public Works

Supervisors" who report to the Assistant Director. Each Public Works Supervisor has

responsibility over a specific sub-department[3] within the Public Works Department,

---

[2] The facts set out herein are gleaned, in substantial part, from the facts proffered by the parties. To the extent that a party has proffered a fact which is not disputed, it has been included herein exactly as it was proffered, without citation. To the extent that a fact proffered by a party was disputed by another party, the Court first examined the proffered fact to determine whether the evidence cited in support of that fact actually supported the fact as stated. If it did not, the fact was not included. If it did, the Court then looked to whether the evidence cited in support of the dispute actually established a dispute. If it did not, the Court presented the fact as proffered, with citation to the evidence supporting the fact as proffered. If the cited evidence was disputed by contrary evidence, the evidence was viewed, as this Court must, in the light most favorable to the non-movant, with citation to such supporting evidence. If more explanation was needed, the Court included that information in an appropriate footnote. Some facts proffered by the parties, which the Court deemed irrelevant and/or immaterial, may have been omitted. Further, as necessary, the Court may have included additional facts cast in the light most favorable to the non-movant.

[3] The term "sub-department" has been used by the Court to avoid confusion. The City does not categorize its departments in that manner.

including: Construction; Grass and Clean-up; and Garbage and Trash (which also includes recycling and animal control).[4] Within each sub-department there are Labor Supervisors, who report to the Public Works Supervisor over that sub-department.[5] The Labor Supervisors supervise the "Laborers" in each sub-department. It is undisputed that the City's mayor, Kenneth Gulley, has the authority to make all hiring decisions, including the authority to fill the position at issue.

### B. The Position at Issue

A Public Works Supervisor position became available in the spring of 2015, after the City terminated the Public Works Supervisor over the Construction sub-department. (Doc. 23-1 at 12(41)). The job posting for the position describes the position as: "Public Work Supervisor (Construction)" and "Public Works Supervisor (Construction or Sanitation)." (Doc. 29-5 at 2-3).[6] It describes the work as involving "planning, assigning, supervising and inspecting the work of several crews engaged in construction, repair and maintenance of multiple public works projects such as

---

[4] At the time of the events of this case, a fourth Public Works Supervisor position, which apparently was over no specific sub-department, was vacant.

[5] As will be discussed, the position at issue in this case is over the Construction sub-department. It is undisputed that, at the time of the events described in this case, the other Public Works Supervisors were Shawn Williams, who was over Garbage and Trash, and James King, who was over Grass and Clean-up.

[6] The document cited is the Personnel Board of Jefferson County posting for this position. McLaughlin agreed in his deposition that this document reflected "the position that Ms. Potts and Mr. Strother interviewed for." (Doc. 23-5 at 37(143)).

highway, street, or sidewalk/driveway construction projects," and "planning, assigning, supervising, evaluating and inspecting the work of several crews engaged in sanitation activities such as refuse collection and disposal, brush and trash pick up and disposal street sweeping and other activities through lower level supervisors." (Doc. 29-5 at 2).

The City is subject to the same hiring rules as the Personnel Board of Jefferson County ("PBJC"). Accordingly, because the position of Public Works Supervisor is a "classified" position, before filling the position the City was required to, and did, obtain a list of eligible applicants certified by the PBJC. The list was sent to McLaughlin and Hatter to determine which candidates to interview. They decided to interview Potts and Ronald Strother, both of whom were already employed by the Public Works Department and were the only persons from within the department to be certified.[7]

### C.   The Candidates

####    1.    *Strother*[8]

---

[7] Other individuals from outside the Department, all of whom were male, also applied for the position. The City did not interview any of these outside candidates.

[8] The Court has adopted the City's version of Strother's qualifications. First, the Court notes that most of these facts are undisputed. (*See* doc. 22 at 7-8, ¶¶15-22; doc. 28 at 4 (disputing only ¶¶20 and 21)). Further, as noted *supra* at note 1, even if the City's version is used, the City has not shown that it is entitled to summary judgment.

Strother was initially hired at the City as a temporary laborer on November 30, 1994, and then hired as a full time laborer on March 7, 1995. As a laborer, Strother worked in several areas, including within the construction department in the chert pit, in the landfill, laying pipe, and fixing headwalls.

From laborer, Strother was promoted to Truck Driver and then to Heavy Equipment Operator ("HEO"). Strother worked as an HEO operating a "knuckle boom" (or brush truck) until he was promoted to Labor Supervisor effective October 27, 2001. For his first several years as a Labor Supervisor, Strother was responsible for overseeing a grass cutting/right of way maintenance crew. Over time, however, Strother also took on responsibility for overseeing numerous other types of crews within the Department. Strother has supervised: garbage service; litter route pick-up; community service (litter pick-up); and a catch basin, storm water BMP, and lid crew. (Doc. 23-9 at 4(10), 15(53), 15(55), 15(56); doc. 23-10). In addition to supervising each of those crews as a Labor Supervisor, Strother also has supervised: street sweeper/night crews (doc. 23-9 at 4(10)); stump grinder crews (doc. 23-9 at 15(54)); animal control (doc. 23-9 at 15(55-56)); training for the Commercial Driver's License ("CDL") exam (doc. 23-9 at 15(55)); and herbicide/pesticide (doc. 23-9 at 4(11)).

At the time of the promotion decision at issue in this case, Strother had only received two written warnings over the span of his entire employment with the City

and had never been suspended.

### 2. *Potts*

Potts began working for the City as a laborer in 1999. She was then promoted to Truck Driver in 2001. In 2009, the City promoted Potts from Truck Driver to Labor Supervisor. At that time, Hatter was a Public Works Supervisor, who supervised Potts and recommended Potts for the promotion to Labor Supervisor. Prior to the time of the Public Works Supervisor promotion decision at issue, Potts almost exclusively had only supervised a cutting crew (performing right of way maintenance) as a Labor Supervisor. (*See* doc. 1 at 3, ¶9; doc. 1 at 4 ¶19). In addition, as a Labor Supervisor Potts also supervised (1) garbage service; (2) litter route pick-up; (3) community service (litter pick-up); and a (4) catch basin, storm water BMP, and lid crew. The Plaintiff testified that, on three separate occasions, each for only one or two days on a fill-in basis, she has also supervised a stump grinder crew, a tree crew, and a concrete crew. (Doc. 23-6 at 7(24)-8(25), 35(134-136)).

At the time of the promotion decision at issue in this case, Potts had received thirty-three written warnings for violations of department policy during her employment with the City. Potts had also been suspended from work for a period of three days as a result of policy violations.

### D. The Interview Process and Decision

After deciding to interview Potts and Strother for the Public Works Supervisor position, McLaughlin and Hatter brought in both candidates, together, for an initial meeting. During that meeting, McLaughlin told the candidates that he was glad to have two good candidates for the position. Both candidates were invited to submit a resume, and did so. (Doc. 23-3 at 5,6).[9]

After the preliminary meeting, Hatter and McLaughlin then brought back each candidate for a separate, individual interview with them. Potts interviewed on April 6, 2017. McLaughlin confirmed during his deposition that "[a]t the time Ms. Potts interviewed for the position that Ronald Strother got, she was actually interviewing for the construction job that was previously held by [the employee who had been terminated]," and that "the interview would have been questions about the construction-related job." (Doc. 23-5 at 25(96)). Hatter also stated that at the time of the interviews they "were asking them questions about the construction job," and that the intent [was] to put them in the construction job." (Doc. 29-1 at 5(16)-6(17)).

Strother testified that when he interviewed, McLaughlin and Hatter told him that it was for the Public Works Supervisor position "under construction." (Doc. 23-9

---

[9] What the parties refer to as Potts's "resume" is actually a letter in which she explains her qualifications for the position.

at 6(18)). Strother testified:

> I talked about all my experience and how long I had been there, and I
> had brought it out that I had really a lot of experience in that department.
> Wherever they needed me, I was there. I mean, I've been all over that
> department. There wasn't nowhere I couldn't fit in.

(Doc. 23-9 at 7(21)).

Following the interviews, and his review of their files, Hatter submitted a

written recommendation to McLaughlin. In that recommendation, Hatter stated that

he considered both Potts and Strother to be "very good employees with the City of

Bessemer with a tremendous future ahead of them." (Doc. 23-3 at 3). He then

recommended Strother for the position writing:

> I have no reservations that Ronald has all the abilities and qualities
> which are required to thrive on this level of the department. He has
> strong dedication which is evident in the many hours that he has spent
> working during emergency situations. He has the leadership qualities as
> he displays it [sic] through inspiring and motivating others to train for
> their commercial driver's license and he serves on the employee
> relations committee a position elected by employees. He is a very
> disciplined employee and requires the same in all of those assigned to
> his supervision.
>
> I highly recommend Ronald for the position of Public Works Supervisor
> and hope that you will carefully consider this letter of recommendation
> for promotion.

(Doc. 23-3 at 3-4).

After receiving Hatter's recommendation, McLaughlin submitted his own

recommendation to Mayor Gulley which stated, in pertinent part:

> After considering both candidates equally, I found Ronald Strother to be more qualified by nature of experience. He has a longer tenure, has been a labor supervisor longer, and has experience in more areas of operation. I have found him to be disciplined, self-motivating, and willing and able to function with little or no supervision.
>
> Therefore, my recommendation would be to promote Ronald Strother to the position of Public Works Supervisor.

(Doc. 23-3 at 2). In addition to his own recommendation, McLaughlin also gave the mayor a copy of Hatter's recommendation (doc. 23-3 at 3), and the resumes submitted by each candidate (doc. 23-3 at 5, 6).

Mayor Gulley reviewed both McLaughlin's and Hatter's written recommendations and the candidates' resumes. At one point in his deposition, the mayor testified that, other than that material that was sent to him by McLaughlin, he did not go out and look at any other material. (Doc. 23-1 at 5(16)).[10] Later, he stated

---

[10] The following exchange took place in the mayor's deposition:

Q.    What I am getting at is, other than the material they send you, for example in this case, they sent you a couple of letters of why they recommend Ronald over Lisa, and we will get to that in a minute. Other than that material that they send you, do you as a mayor go out and look at any other material, and did you do that here?

A.    No.

Q.    Okay. I was trying to get at, Lisa has got a personnel file, she has got some other files and records and things like that. Do you go behind them and start digging through their personnel files and things like that?

that he also reviewed the past disciplinary histories of both candidates (doc. 23-1 at 10(34))[11], but that disciplinary history was not "the deciding factor" (doc. 23-1 at 10(38)). It is undisputed that Mayor Gulley did not review the Plaintiff's application or the performance appraisals of either candidate.

As far as how he makes a decision to promote one candidate over another, the mayor testified that he relies on the recommendation of McLaughlin, but that "we also have a dialogue." (Doc. 23-1 at 6(17)). Indeed, in this case, after receiving McLaughlin's recommendation, the mayor also had a further discussion in which he

---

. . .

A.      No, I do not do that.

(Doc. 23-1 at 5(16)).

[11] The following exchange took place in the mayor's deposition:

Q.      What other documents did you receive when you made the selection decision?

A.      The past disciplinaries on both.

Q.      I had asked you previously and you said "no." So when did you review those?

A.      I reviewed those after I reviewed and saw these right here.

Q.      So did they give you their disciplinary files?

A.      Yes. We looked at their disciplinary files.

(Doc. 23-1 at 10(34)).

asked McLaughlin to explain the basis for his recommendation. McLaughlin told Mayor Gulley that Strother had more seniority both overall as a City employee and as a Labor Supervisor.

The mayor also spoke with Shawn Williams, by phone, who at the time was the Public Works Supervisor over the Garbage and Trash sub-department. When asked in his deposition who Williams recommended, the mayor stated "he may have said Ronald Strother as well." (Doc. 23-1 at 21(80)). Mayor Gulley testified that Williams gave no reason for his recommendation.

Mayor Gully ultimately decided to hire Strother. The mayor testified that the deciding factor was "[t]he total recommendation and stuff." (Doc. 23-1 at 11(38). In his deposition he agreed that Strother was more qualified than Potts "by nature of experience," because of "the scope of all the things that he had done." (Doc. 23-1 at 13(47)). That included being a heavy equipment operator, a fact which he learned from Strother's resume, something which Mayor Gulley agreed was "important." (Doc. 23-1 at 13(45, 46)).

**E.**     **Strother Was Promoted into a Different Position than the One for Which He and the Plaintiff Applied**

On April 16, 2016, McLaughlin provided a written memo to the mayor recommending a "supervisor reorganization" which would put Strother over the

"Street Department," and the mayor approved the recommendation. (Doc. 29-9 at 2; doc. 23-5 at 25(96)). Strother's duties under the reorganization were to be "Supervise Right-of Way maintenance; grass-mowing, ditch cleaning, lot cutting, clean catch basins"; "Supervise Community Service Workers – Litter pick up"; "Assist employees in training and preparing for CDL examination"; and "Supervise animal control." (Doc. 29-9 at 2). No construction was included.[12] Mayor Gulley testified, "I don't know which came first, the hire [of Strother] or the restructuring." (Doc. 23-1 at 12(43)). McLaughlin believes that Strother had already been chosen by the time the reorganization occurred.

In his deposition, McLaughlin agreed that Strother was put over the Street Department without the position being posted. Similarly, James King, the Public Works Supervisor over "Grass and Cleanup" was moved into the Construction job without being interviewed for it. McLaughlin testified that he recommended to the mayor that the switch be made because "King had been a labor supervisor in the Construction [sub-department]," and therefore was more qualified for the construction job than Strother. (Doc. 23-5 at 14(50)). Hatter stated:

we figured that Mr. King, you know, having had more experience in this

---

[12] When asked, "Did anybody get an opportunity to interview for that particular job?," *i.e.*, over grass crews, Hatter answered, "No, sir. At the time we interviewed, the job we was interviewing for was construction." (Doc. 29-1 at 15(55)).

line of work right here, we figured he would be more capable of doing this particular job, and also the fact that Mr. King was a senior public works supervisor, and this department basically consists of a whole lot of senior employees. So we figured it would be an easier transition to have an older public works supervisor take on these duties and have a new public works supervisor go over there and work around, you know, the people they normally work around every day anyway, you know, so.

(Doc. 29-1 at 17(61-62)). Mayor Gulley also agreed that King would "be more qualified to do the Construction area." (Doc. 23-1 at 14(51)). Mayor Gulley relied on McLaughlin's recommendation that King's experience would be better suited to construction. (Doc. 23-1 at 14(52)).

### F.    McLaughlin's Conversation with Potts

In a meeting on April 20, 2015, McLaughlin met with the Plaintiff to inform her that Strother had been selected instead of her for the position. McLaughlin explained to the Plaintiff "that he didn't think that a woman was equipped for the public works supervisor position." (Doc. 23-6 at 11(37-38)).[13] That same day, the

---

[13] McLaughlin disputes that he made this comment. In his deposition he states:

> I told her why I called her in, to basically inform her of the decision that was made, that Ronald would be assuming the work spot; and she asked me why, and I basically told her that, you know, I made the recommendation to the mayor that Ronald get the job. He had longer tenure, and he had more experience in more areas.

(Doc. 23-5 at 16(64)). Then, the following exchange took place:

> Q.    Did she ask you if you did this because she's a female?
>
> A.    She may have asked me that, yes; and I told her no, that was no bearing.

Plaintiff wrote Mayor Gulley and informed him that she was "well qualified" for the position and that Strother "had no experience in [the] area," and that she felt like she was not hired because she was a woman. (Doc. 23-12 at 2).[14]

## III. ANALYSIS

### A. <u>This Is a Mixed Motive Case</u>

Before discussing the merits of the Motion for Summary Judgment, it is important to discuss the nature of the Plaintiff's claim. As the Eleventh Circuit has explained:

> Discrimination claims brought under Title VII and § 1983 are typically categorized as either mixed[]motive or single[]motive claims. An employee can succeed on a mixed[]motive claim by showing that illegal bias, such as bias based on sex or gender, "was a motivating factor for" an adverse employment action, "even though other factors also motivated" the action. 42 U.S.C. § 2000e–2(m); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) (finding that a plaintiff can meet her burden in a § 1983 case by showing a protected characteristic was a "motivating factor" in an adverse action). In contrast, single-motive claims—which are also known as "pretext" claims—require a showing that bias was the true reason for the adverse action. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 251–53, 101 S.Ct. 1089, 1092–93, 67 L.Ed.2d 207 (1981) (considering a single-motive, gender-based discrimination claim).

*Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (footnote

_____

(Doc. 23-5 at 18(65)).

[14] She did not mention McLaughlin's comments to her about her gender in this letter.

omitted).[15] The plaintiff argues that her claim is a mixed motive claim. The Defendant disagrees.

The Defendant argues that the Plaintiff "is required to give notice of her 'mixed motive' claim in her complaint, and cannot assert such a claim by raising it for the first time in response to a motion for summary judgment." (Doc. 33 at 10). The Defendant is correct. *See Keaton v. Cobb Cty., GA*, No. 08-11220, 2009 WL 212097, at *10 (11th Cir. Jan. 30, 2009) ("Keaton did not raise the 'mixed motive' issue in her original complaint, and her footnote [in the response to the motion] was sufficient neither to provide appellees with adequate notice of the new claim nor to amend the original complaint."). Accordingly, the Court must examine whether the Plaintiff gave the Defendant adequate notice of a mixed motive claim in her Complaint.

In the instant case, the Complaint alleges that "Plaintiff's female gender was a motivating factor in Defendant's decision to promote a male over her into the Public Works Supervisor position." (Doc. 1 at 5, ¶27) (emphasis added). The court does not agree with the City's characterization of this language as merely "a vague, passing

_____

[15] In its reply brief in support of its motion to strike, the City notes that *Quigg* "was not issued until after the Plaintiff filed the Complaint [in this case]." (Doc. 35 at 1, n. 1). *Quigg* articulated a standard set out much earlier by the United States Supreme Court in *Doyle*, 429 U.S. at 287. Accordingly, the Court sees no relevance to this argument.

18

reference to gender being a 'motivating factor'" (doc. 33 at 11).[16] The Complaint

buttresses this allegation by affirmatively stating that "McLaughlin stated to Plaintiff

that he did not think that women were equipped for the Public Works Supervisor

position." (Doc. 1 at 3, ¶15). This language is sufficient to put the City on notice that

the Plaintiff was making a mixed motive claim.[17]

---

[16] Rule 12(e) of the Federal Rules of Civil Procedure provides that a party may "move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). The Court notes that at the time it filed its Answer, and its Amended Answer, the City apparently felt that this language was not so vague after all. (*See* doc. 8 at 5, ¶27 (responding to the "motivating factor" allegation with only the word "Denied"); doc. 18 at 5, ¶27 (same)). For this same reason, the Court sees no merit in the City's argument that the "motivating factor" standard applies in all discrimination cases. (*See* doc. 35 at 1, n. 1). Use of that phrase, along with the facts articulated in the Complaint, put the City on notice that this was a mixed motive case.

[17] All of the cases cited by the City are distinguishable or inapplicable. *See Keaton v. Cobb Cty., GA*, No. 08-11220, 2009 WL 212097, at *10 (11th Cir. Jan. 30, 2009) (single passing reference to a mixed motive theory in a footnote to a brief in response to a Motion for Summary Judgment); *Oliver v. Lhoist N. Am. of Alabama, LLC*, No. 2:15-CV-00689-LSC, 2016 WL 5253211, at *4 (N.D. Ala. Sept. 22, 2016) (Coogler, J.) ("Oliver alleges that he was placed on a LFCA because of his race and in retaliation for the EEOC charges that he filed."); *Schechter v. Georgia State Univ.*, 341 F. App'x 560, 563 (11th Cir. 2009) ("[Plaintiff] does not allege that her case is a mixed motive case."); *E.E.O.C. v. Frederick J. Hanna & Assocs.*, No. CIV.A. 1:08-CV-832-J, 2009 WL 2600101, at *16 (N.D. Ga. Aug. 11, 2009) (Carnes, J.) (finding that "the EEOC did not allege a mixed motive case in its complaint," but not discussing allegations therein); *Bicknell v. City of St. Petersburg*, No. 8:03-CV-1045-T-27, 2006 WL 560167, at *13 (M.D. Fla. Mar. 7, 2006) (Whittemore, J.) (noting that Plaintiff "makes a generalized reference to the City's alleged mixed motives, [but] has not alleged a mixed[]motive claim in her Complaint," and failing to analyze the allegations in the complaint). Further, the Court is not persuaded by the Defendant's argument that language in the Complaint such as that the City "promoted a substantially less qualified male over her" (doc. 1 at 5, ¶26), that the City "failed to articulate a legitimate non[-]discriminatory reason" (doc. 1 at 6, ¶28), or that there was "a pattern and practice of discrimination" (doc. 1 at 6, ¶29), require this Court to interpret the claim as merely a single motive claim. While this language might support an additional claim, in the alternative, for single motive discrimination, the Court sees no reason why the inclusion of such language would necessarily foreclose a mixed motive claim.

## B.    The Plaintiff's Mixed Motive Claim Survives Summary Judgment

Having determined that the Plaintiff has alleged a "mixed motive" case, the Court turns to the merits of the Defendant's Motion for Summary Judgment. The City utilizes the traditional, and well known, *McDonnell Douglas*[18] framework for evaluating discrimination claims. However, that approach is not appropriate for examining mixed motive claims. *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016). Instead, the Eleventh Circuit has stated that a plaintiff need only offer evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against her; and (2) a protected characteristic was a motivating factor for the defendant's adverse employment action. *Quigg*, 814 F.3d at 1239. Stated differently, the court must determine whether the plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that the protected characteristic, in this case her gender, was a motivating factor for the adverse employment decision. *Id.* The Plaintiff's entire argument on this issue is based on McLaughlin's comment "that he didn't think that a woman was equipped for the public works supervisor position." (Doc. 23-6 at

---

[18] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) *holding modified by Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993).

11(37-38)).[19]

The City first argues that the remark should be disregarded because it is "blatantly contradicted by the record." (Doc. 22 at 25).  The City correctly notes that McLaughlin told the candidates, and the mayor, that the Plaintiff was a "good candidate" for the position, and that each time she complained of discrimination she did not mention this alleged statement. (*See* doc. 22 at 25).[20]

---

[19] The Plaintiff argues that, pursuant to Rule 801(d)(2)(D) this statement is admissible against the City. (*See* doc. 28 at 24-25). Because the City does not argue that the statement is <u>in</u>admissible, the Court will not address this moot argument.

[20] The City writes:

> Plaintiff alleges in this lawsuit that McLaughlin told her that "he didn't think that a woman was equipped for the public works supervisor position." (Ex. 6 - Potts Dep. at 38). Potts claims this comment was made before she went to either Mayor Gulley or the EEOC to complain of discrimination. Accordingly, the Court probably would expect to find at least a passing reference to this comment in Potts'[s] EEOC Charge, which is solely based on this single promotion decision (Ex. 14); Potts'[s] answers to the EEOC Intake Questionnaire directly asking Potts why she thought she had been discriminated against (*id*.); Potts'[s] letter to Mayor Gulley complaining that she believed she had been discriminated against when she was not selected for the Public Works Supervisor position (Ex. 12); or Potts'[s] hour-long, secret recording of her meeting with Mayor Gulley to discuss her complaint of discrimination about not being promoted to Public Works Supervisor (Ex. 13). The Court will not find mention of this alleged comment in any of the four ways Potts articulated her claim of discrimination prior to her Complaint.
>
> Predictably, there are no witnesses to the conversation in which Plaintiff claims this remark was made. (*Id*.; Ex. 5 - McLaughlin Dep. at 175-76). McLaughlin denies making this remark (Ex. 5 - McLaughlin Dep. at 175-76), and it is in direct contradiction to both Potts'[s] own testimony and McLaughlin's written recommendation to Mayor Gulley stating that he considered both Strother and Potts to be "good candidates" for the position. (Ex. 6 Potts Dep. at 34 ("Bill McLaughlin . . . told us he'll let us know when he get[s] ready to have a[n] interview with us separately at the time and he thought both of us was good candidates for the

When the City writes that "[t]he Court is justified in holding that Potts'[s] testimony is so blatantly contradicted by the record that it should be disregarded" (doc. 22 at 25) it appears to be channeling similar language used in *Scott v. Harris*, 550 U.S. 372 (2007). In *Scott*, the Supreme Court wrote, in the context of ruling on a motion for summary judgment, that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that [blatantly contradicted] version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. In that case, there was a factual issue as to whether the respondent was driving in such fashion as to endanger human life. He testified that he was not, but a video recording clearly demonstrated that he was. The Supreme Court held that

> Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

*Id.* at 380–81.

The situation in *Scott* is distinguishable from the facts of the instant case. Unlike the video recording in *Scott*, none of the circumstances argued by the City

---

position."); Ex. 3 - McLaughlin Recommendation). The Court is justified in holding that Potts'[s] testimony is so blatantly contradicted by the record that it should be disregarded.

(Doc. 22 at 24-25).

eliminate the possibility that McLaughlin did not also later tell the Plaintiff "that he didn't think that a woman was equipped for the public works supervisor position." Certainly the ultimate trier of fact could decide that these circumstances make the Plaintiff's allegation seem less credible. However, these are arguments better suited for cross examination and closing arguments than for a motion for summary judgment. At the present junction, this Court cannot weigh the evidence or make credibility determinations. The Court, as it must when ruling on a Motion for Summary Judgment, casts this fact in the light most favorable to the Plaintiff and assumes that McLaughlin made the comment.[21]

That does not end the inquiry however, because it is undisputed that the mayor, not McLaughlin, had the sole authority to, and did, make the hiring decision in this case. Still, in such cases

> [a] plaintiff may show that discriminatory animus caused an adverse employment action by proving that a biased party with no power to take the adverse action made a recommendation that directly resulted in the action. Under this standard, a plaintiff may maintain a "cat's paw" theory of discrimination by establishing that the decisionmaker followed a biased recommendation without independently investigating it.

---

[21] The city also spends a large part of its brief arguing that McLaughlin's comment is not "direct evidence" of discrimination. (Doc. 22 at 26-34). The Court does not see the relevance of that argument since "an employee can prove a mixed[]motive case with direct or circumstantial evidence." *Quigg*, 814 F.3d at 1237. The Court does, however, agree with the Defendant that McLaughlin was not the decisionmaker in the case. He did, however, make a recommendation to the mayor that Strother be hired.

*Stevens v. City of Forest Park*, 635 F. App'x 690, 700–01 (11th Cir. 2015) (*citing*

*Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir.1999)) (internal

citations omitted). However, and importantly,

> an independent investigation by an employer <u>does not necessarily
> immunize the employer from liability</u>. "[I]f the employer's investigation
> results in an adverse action for reasons unrelated to the supervisor's
> original biased action ..., then the employer will not be liable."
> However, "the supervisor's biased report may remain a causal factor if
> the independent investigation takes it into account without determining
> that the adverse action was, apart from the supervisor's recommendation,
> entirely justified."

*King v. Volunteers of Am., N. Alabama, Inc*., 502 F. App'x 823, 828 (11th Cir. 2012)

(emphasis added) (*quoting Staub v. Proctor Hosp*., 562 U.S. 411, 421, 131 S. Ct.

1186, 1193, 179 L. Ed. 2d 144 (2011)).

The City argues that the facts of the instant case are similar to those in *Stevens*

*v. City of Forest Park*, 635 F. App'x 690 (11th Cir. 2015). In *Stevens*, an hispanic

female former police captain with the City of Forest Park brought an action claiming

that she was terminated based on her race and gender in violation of Title VII. Her

supervisor, Major Matson, recommended to the police chief, Chief Hobbs, that she

be terminated. Evidence was presented that Matson, on several occasions, had made

statements and engaged in conduct which demonstrated gender bias. Instead of

recommending termination to the city manager, Chief Hobbs decided to issue Captain

Stevens a "Last Chance Agreement," which is the most severe sanction, short of termination, which the department could issue. When Captain Stevens refused to sign the agreement, Chief Hobbs recommended to the city manager that she be fired and that recommendation was accepted. In rejecting the "cat's paw" theory of liability, the Eleventh Circuit wrote:

> The problem for plaintiff Captain Stevens is that Chief Hobbs did not merely accept Matson's assessment of Stevens without investigating and reaching his own conclusions. The record reflects that Hobbs personally reviewed Stevens's disciplinary history, personally spoke with Stevens at length prior to her termination (thereby giving her the opportunity to tell her version of events), and personally revised the Last Chance Agreement. Notably, many critical facts that motivated Hobbs to discipline Stevens are not in dispute, namely that Stevens approached panel officers with the conclusion that the accident was non-chargeable without providing the officers with photographs of the accident. Given Chief Hobbs's level of involvement in the process leading up to Stevens's termination, Stevens fails to plausibly show that the adverse action she suffered was the product of Matson's alleged bias.

*Stevens*, 635 F. App'x at 701.

The facts in the instant case are easily distinguishable from those in *Stevens*. First, the mayor admits that he relied on McLaughlin's recommendation. (Doc. 23-1 at 6(17)). Second, there is no evidence that the mayor in this case had the same or even close to the same "level of involvement" in the decision as Chief Hobb's in *Stevens*. Recall that McLaughlin's recommendation of Strother over the plaintiff was, on its face, based on his alleged superior experience and certain leadership qualities

such as Strother being disciplined, self-motivating, and willing and able to function with little or no supervision. The City notes that the mayor reviewed the resumes of each applicant (*see* doc. 22 at 30), but it is unclear how this aided his decision since, in his deposition, he admitted that he "didn't really know what Ms. Potts was doing every day or Mr. Strother was doing every day." (Doc. 23-1 at 18(66)). There is no evidence that the mayor spoke with the Plaintiff, or Strother, prior to making the decision to accept McLaughlin's recommendation, in an effort to confirm their respective qualifications.[22] The mayor did speak to McLaughlin, who has alleged to have injected gender bias into the selection process, and who cannot said to be "independent." *See, King*, 502 F. App'x at 828.[23] Further, it is undisputed that Mayor Gulley did not review the Plaintiff's application or the performance appraisals of either candidate. Finally, although the mayor did review the disciplinary records of each candidate, it is unclear what difference those made to his decision since: (1) they arguably had no bearing on the level of experience and abilities of either candidate--

---

[22] Indeed, there is evidence that the mayor actively avoided an attempt at an independent investigation even when the Plaintiff brought this issue to his attention. In her letter to the mayor after she was denied the promotion, the Plaintiff made it clear she felt like she was better qualified and had been discriminated against based on her gender. The mayor testified that he did not investigate this complaint because "[e]verybody that don't get a promotion feels that they have been wronged." (Doc. 28 at 28).

[23] The mayor also spoke with Williams, who may or may not have recommended Strother, and, even if he did, gave no reasons for his recommendation.

the reason Strother was recommended, by McLaughlin, over Pitts; and (2) the mayor testified that the histories were not "the deciding factor." (Doc. 23-1 at 10(38)).[24]

Importantly, the City is correct when it notes that McLaughlin's recommendation was consistent with Hatter's, and that there is no allegation of gender bias being made against Hatter. (Doc. 22 at 31-32). However, the mayor testified in his deposition that he relies on his department head's (McLaughlin's) recommendation. (Doc. 23-1 at 6(17)). Furthermore, the mayor did not speak with Hatter. Regardless, because McLaughlin was Hatter's superior, a jury could reasonably determine that Hatter's recommendation was tainted by the chain of command. In any case, considering all of the circumstances in this case, the Court cannot say, as a matter of law, that the reliance on Hatter's opinion, alone, or in combination with anything else, was a sufficiently "independent" investigation to overcome McLaughlin's allegedly gender biased recommendation.

## C.    The "Same Decision" Defense

Even though the City is not entitled to summary judgment on the issue of whether the Plaintiff's gender was a motivating factor for her not getting the

---

[24] The City argues that "one of the reasons for his decision was the vast disparity in [the candidates' disciplinary histories]." (Doc. 33 at 13 (citing doc. 23-1 (Gulley's Deposition) generally at 10(34)-11(38)). The cited portions of the deposition merely reflect that the mayor reviewed the records, and that they were <u>not</u> "the deciding factor." (Doc. 23-1 at 11(38)).

promotion, the City asserts that it would have made the same decision even in the absence of the alleged bias. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1269 (11th Cir. 2001). To establish the "same decision" defense,

> the employer's evidence "must show that its legitimate reason, standing alone, would have induced it to make the same decision." [*Price Waterhouse v. Hopkins*, 490 U.S. 228, 252, 109 S.Ct. 1775, 1792, 104 L.Ed.2d 268, (1989)]. A legitimate reason does not sufficiently stand alone when an employer "merely state[s] that the employment decision was based on the hiring of the best qualified applicant." Instead, the employer "must articulate specific reasons for that [chosen] applicant's qualifications such as seniority, length of service in the same position, personal characteristics, general education, technical training, experience in comparable work or any combination" [*Steger v. General Electric Co.*, 318 F.3d 1066, 1076 (11th Cir.2003) (internal quotations omitted)].

*Brewer v. Dupree*, 356 F. Supp. 2d 1261, 1267–68 (M.D. Ala. 2004) (Thompson, J).

Further,

> a defendant [cannot] avoid liability altogether through [such] proof, but can limit the scope of plaintiff's available remedies. *See* 42 U.S.C. § 2000e-5(g)(2)(B) ("On a claim in which an individual proves a violation under section 2000e-2(m) of this title [*i.e.*, a mixed[]motives case] and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court ... (ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described [herein].").

*King v. CVS Caremark Corp.*, 163 F. Supp. 3d 1165, 1195 n. 19 (N.D. Ala. 2016) (Hopkins, J).

The Plaintiff argues that the City

> has not moved for summary judgment on a 'same decision' defense
> which would be its burden to prove. (Nor may Defendant do so in a
> reply brief to which Plaintiff would not have the opportunity to respond,
> as the summary judgment deadline has passed.)

(Doc. 28 at 19). Although the City does not use the phrase "same decision" in its

initial motion, it does set out, and provide evidence in support of, a number of reasons

why Strother was hired over the Plaintiff, albeit as part of the *McDonnell Douglas*

pretext analysis. Further, in its initial brief the City anticipated the Plaintiff arguing

that she was asserting a mixed motive case and concludes its argument by noting that

> it is objectively and indisputably true that Strother had more seniority
> both at the City overall (almost five years) and as a Labor Supervisor
> (eight years), had worked as a Heavy Equipment Operator and Plaintiff
> had not, and had a superior disciplinary record (two writes ups and no
> suspensions for Strother compared to thirty-three write ups and a
> three-day suspension for Potts). On these undisputed facts, the "cat's
> paw" theory is inapplicable, and judgment is due on Plaintiff's claim of
> discrimination as a matter of law.

(Doc. 22 at 33). All of this was sufficient to put the Plaintiff on notice that the City

was asserting the "same decision" defense.[25] Accordingly although the Court will not

consider new grounds for summary judgment raised for the first time in a reply brief,

*see Carter v. Univ. of S. Alabama Children's & Women's Hosp.*, 510 F. Supp. 2d 596,

---

[25] Recall that the Court gave the Plaintiff similar leeway in holding that a mixed motive
claim had been asserted, even through the phrase "mixed motive" appears nowhere in the
Complaint.

608 (S.D. Ala. 2007) (Steele, J.) (and cases cited therein), that is not the case here.

That having been said, the court cannot say that the City has eliminated any genuine issue of material fact as to whether it would have made the same decision regardless of the consideration of the Plaintiff's gender. The City states that Strother was hired over the Plaintiff was because: 1) he had more seniority than the Plaintiff; 2) he had more experience in more areas of operation than the Plaintiff; 3) he demonstrated leadership abilities; and 4) he had a better disciplinary record. (*See* doc. 22 at 20-24). What is missing, however, is any discussion of the <u>particular requirements of the job</u> in light of these factors. The mayor made the ultimate decision, but the City offers vague testimony from the mayor such as that the deciding factor was "[t]he total recommendation and stuff" (doc. 23-1 at 11(38), and that Strother was more qualified than Potts "by nature of experience" and because of "the scope of all the things that he had done" (doc. 23-1 at 13(47)). Although the mayor mentions that Strother was a heavy equipment operator, the City has cited no evidence as to why that should have been a factor.

Furthermore, a reasonable jury could conclude that the reorganization had occurred prior to Strother's having been hired. If true, it is even less clear why Strother's qualifications for the job <u>he ultimately got</u> were better than those of Potts, especially since Potts, in supervising a cutting crew as a Labor Supervisor, had been

doing some of the same functions for which Strother ultimately was responsible. This is particularly important in light of the undisputed fact that the reorganization was recommended by McLaughlin, the very person who is alleged to have injected gender bias into the equation. On these facts, cast in the light most favorable to the Plaintiff, the Court also cannot say that the City is entitled to summary judgment based on the same decision defense.

## IV.    CONCLUSION

Based on the foregoing, it is hereby **ORDERED, ADJUDGED**, and **DECREED** that the City's Motion for Summary Judgment is **DENIED**. The City's Motion To Strike is **DENIED as moot**.

**DONE** and **ORDERED** this 25th day of August, 2017.

**VIRGINIA EMERSON HOPKINS**
**United States District Judge**